I want to once again thank the University of A&M Law School for hosting this. They've been just tremendous. We've all gained five pounds so far. Two more days to go, but it's been very lovely. The first case on our docket this morning is 23-60286, United States of America v. Bourrage. Bourrage, okay. And I'm not going to try. I'm going to mispronounce. Would you give me some help? Surely, Your Honor. Thank you. I'm M. Hotep Al-Kiboulan. Okay. And I represent Donovan Shirell Bourrage, the defendant appellate. Here, the procedure for interception of wire, oral, or electronic communications was violated where the order for assistance did not specify the identity of the person authorizing the application. This is known as the order identification requirement, thus rendering the order for assistance insufficient on its face. The applicable statute is 18 U.S.C. 2518-4D, which requires each order authorizing or approving the interception of any wire, oral, or electronic communication under this chapter shall specify the identity of the agency authorized to intercept the communication and of the person authorizing the application. Now, to determine whether a wiretap order is facially insufficient, a reviewing court must examine the four corners of the order and establish whether, on its face, it contains all that Title III requires it to contain. And that's under United States v. Chavez and United States v. G. O'Donnell, both decided in 1974 and both cited in our brief. If the order complies with the requirements of Title III, it is sufficient on its face. If it does not comply with those requirements, it is insufficient on its face, citing 18 U.S.C. 2518-10A, subparagraph 2. Now, because this issue wasn't raised in the trial court, it is – and it's being raised for the first time on appeal, it's reviewed for plain error. Under plain error, the first element reviewed is, is there, in fact, an error? And I submit to you, yes, there is. The order for assistance fails to identify the person authorized – authorizing the application. And that's – government exhibits G-1, G-2, and G-3 that were introduced there at the trial court. The second review is, is the error plain? And plain is synonymous with clear and obvious. And it's, we submit, clear and obvious when you review the government's G-1, G-2, and G-3. It omits the identity of the person authorizing the application. The third review element is, is the – does the error affect substantial rights? And the right here being affected is the privacy right of your oral communications. And, but for the error, Mr. Barrage would have received a different outcome. The fourth element of the plain error review is, does the error seriously affect the fairness, integrity, or public – public – excuse me – public confidence in the judicial process? And I'll quote here – excuse me – public reputation of judicial proceedings. I'll quote here the United States versus Giordano previously cited. And it states, compliance with Title III requirements safeguards privacy rights and judicial integrity. And failing to enforce these protections could undermine public confidence in the judicial process. Now, standing at trial, the court found that Mr. Barrage didn't have standing. Standing is governed by 18 U.S.C. 251810A, subparagraph 2. Stating, any aggrieved person in any trial may move to suppress the contents of any wire or oral communication intercepted under this chapter or evidence derived from there because, subparagraph 2, the order of authorization or approval under which it was intercepted is insufficient on its face. Now, the definition of an aggrieved person is found at 18 U.S.C. 2510. An aggrieved person means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed. Now, the prohibition here is 18 U.S.C. 2515, which provides prohibition of use of any intercepted wire or oral communication provided here. And I'm out of time, so I will just state simply for the court, we're asking, one, that you find that the order for assistance is facially insufficient. Second, that you reverse the denial of the motion to suppress and that you remand this matter back to the trial court for proceedings consistent with your order. Thank you. May it please the court, my name is Sam Ferdinand. I represent the appellant, Orlando Burrage. Mr. Burrage before the court after being convicted of conspiracy to distribute methamphetamine in the Southern District of Mississippi back in 2026, for which he received a sentence of 280 months. I want to address, beyond anything in the brief, the issue of whether there was sufficient evidence to support a conviction for conspiracy. Mr. Burrage was only convicted of conspiracy as a result of the indictment of charge in the Southern District of Mississippi. The governor's evidence centered upon seven conversations among the defendants between Orlando Burrage, which is my client, and Donovan Burrage, as well as between Donovan Burrage and Cordell Ford. Cordell Ford, as the court is well known, was at trial, indicated to be a methamphetamine supplier in Kemper County, Mississippi. Based upon the conversations, the intercept conversations in a seven-day period of time, the jury could have found and did find that there was a shipment of methamphetamine that was supposed to be supplied in May of 2020. Part of that shipment was supposed to go to Orlando Burrage and Donovan Burrage. Within a reasonable degree and a rational jury could have found that the conversations involved drug conversations. Mr. Burrage, the Burrage's did discuss the price of methamphetamine. If you recall, back in 2020, it was the height of COVID. The prices had fluctuated. They talked about the profits, their losses. They talked about the expected delivery of the methamphetamine. At one point in time, the delivery was delayed. There were conversations about that. And then on May 28, 2020, the Burrage's found out that the delivery had been seized by law enforcement. And so there are intercept conversations that deal with those conversations. They talked about how he got arrested, when he got arrested, and how he could have avoided getting arrested. But members of the court, even with these conversations, the evidence is not sufficient to establish the first element of an 846 conspiracy. And that is, there was never an agreement, either expressed or implied, to distribute methamphetamine. You see, you never get to the second or third element, that is, knowledge of the involved activity or voluntary participation, until you cross the first. And that there was an agreement to distribute methamphetamine. Let me explain in more detail. Orlando Burrage had his operation. Donovan Burrage had his operation. Each had a separate order from Cordell for the supplier. There was no sharing of customers. One did not recruit for the other. There was no traveling together to conduct drug transactions. There were no use of common storage facilities to store drugs. In fact, in deciding this case, we submit the case of U.S. v. Holloway is very, very similar and pretty much on point. Holloway was a cocaine distributor in Midland, Texas, about 15 years ago. He was convicted of conspiracy to possess cocaine, not methamphetamine, but cocaine. And for that, he got life in prison. The evidence showed that Mr. Holloway had someone who was a supplier. The evidence also showed that Mr. Holloway sold cocaine two to three times a week. It talked about how and how much he would sell. It even talked about, in the case, how Mr. Holloway was a personal user. But this court centered its attention based upon whether or not there was some type of dependent relationship between Holloway and his supplier, the vertical relationship, and Holloway and his co-parts, the horizontal relationship. The court looked at specifically that Holloway, with respect to his suppliers, was not giving drugs on consignment. In the drug trade, in the drug world, sometimes drugs are fronted, given on consignment. The court said, hey, that was not the case. If it were, it would have shown a strong level of an ongoing, mutually dependent relationship. There was no evidence that Holloway was fronted to drugs. There was no evidence that he traveled with anyone to purchase the cocaine. There was no evidence that he purchased the cocaine with anyone else. The government says, hey, there is concern of activity, and here's how. The government says, well, Holloway and the other drug dealers took turns selling on a particular street. They had an agreement. Well, this court says, no, that's not enough. That only shows parallel consciousness or conscious parallelism, the court calls it. That's where you have companies who have the same target group. They operate in the same area, but are not dependent on the other. They were parallel businesses. That's what the court called it. Members of this court, that's what we have between Donovan Burrage and Orlando Burrage. Parallel businesses, parallel operations. Now, the government would also submit that because they associated together, they had drug conversations together, had the same last name together, they both drug dealers together, there must have been some type of concert of action. Well, we would submit that if you look at the case of U.S. v. White, this case, 20, 30 years ago, U.S. v. White, husband and wife team who were charged with conspiracy and convicted thereof to possess with the intent to distribute heroin, husband and wife, lived together, both drug dealers. Evidence pointed out that each had a common supplier. Now, here's the difference. They didn't have any connections beyond that. The persons they were dealing with, they dealt with them separately. In U.S. v. White, this court said that it would be an exercise of sheer speculation to conclude that there was a conspiracy. They were married, lived together, separate operations, both drug dealers. And yet this court said, no conspiracy. That is no different from this case with Orlando Burrage and Donald Burrage. The same analysis would apply even with respect to Ford and Orlando Burrage, the supplier. No connection, no concerted activity. Thank you, Your Honor. May it please the Court, Jennifer Case on behalf of the government in this appeal. The evidence fully supports the convictions. The trial proof established that the Burrage cousins conspired with others to distribute methamphetamine in their community. The proof included testimony from co-conspirators, recorded phone calls and intercepted text messages between the conspirators, and the actual methamphetamine that was seized from the drug courier before it made its way into the hands of Ford and the Burrage cousins. This was more than sufficient to support the jury's verdict. And this evidence at this stage must be taken with a highly deferential view towards the jury verdict of guilty as to the conspiracies. Starting where my learned friend, Mr. Knott, left off with respect to the conspiracy to which Mr. I'll call him Orlando, since they share a last name, Mr. Orlando was engaged. The jury heard evidence starting with Donovan, Orlando's cousin, selling methamphetamine to a confidential informant. The cousins were then heard on intercepted phone calls and in text messages discussing the price of methamphetamine, their desire and their attempt to buy several more pounds of methamphetamine from their supplier, Ford. Their disappointment that law enforcement officers got to that methamphetamine shipment before they did, and then their second guessing about how Ford and others had packaged the methamphetamine that had been shipped across the country to Mississippi. The jury also heard evidence about co-conspirator Gowdy, who was the drug courier driving the car that was intercepted by law enforcement in May 2020. And they heard directly from Gowdy about how the drugs came to be in his car and his role in delivering them to Ford to supply to others. The jury also heard conversations between the Burrage cousins following the drug bust about how they should not contact their supplier, Ford, anymore on his phone. The jury heard evidence from the cousins about who would pay, which of the two Burrage cousins would pay for the drugs, because one of them had to be at work on a certain day and they said, if that's when the transaction goes down, I'll give you my money to give for the drugs. The jury heard following the drug bust of Orlando's decision to change his trap phone, his drug dealing phone, to a different one and to not call Ford anymore on his phone. And the jury also heard the cousins talk about how they would need to get different sources of supply and get drugs out of potentially Arizona. And those things make this case distinguishable from what? Mr. Knott has suggested that the conspiracy has to only be between Orlando and Donovan, and that's not the case. There were many co-conspirators, five of whom were named explicitly at the trial, Donovan, Orlando, Ford, the courier Gowdy, and T.K. Darden who recruited the courier for the particular drug shipment that was intercepted. These men were working together, not only, for example, when Orlando and Donovan had a discussion about who was going to pay for the drugs and how the money was going to get to the supplier for them to then go sell the drugs. The men talked about, you know, I'm out of my drugs, I broke mine down more, mine had, I forget the slang, but basically the residue at the bottom that wasn't worth selling. These men were in close contact with each other about this business and this conspiracy. They were working to distribute methamphetamine and did successfully distribute methamphetamine on the streets of their town in Mississippi. So, yes, it is distinguishable from the White case, Your Honor. I do want to spend a little time on my learned friend, Mr. Akebulon's discussion about Title III. I admit that the government's response misunderstood in part what the argument that Donovan was making in his brief was. So I just want to make sure I've clarified my understanding based on the reply brief and the argument presented here. There are two types of orders or two orders that exist in a Title III case like this. So when the government presents an application for an order for authorization of a Title III wiretap, that is to get the actual order that remains under seal at all times with the court, and that is the order for authorization or approval. The order in this case, or I guess orders because they're different ones for different phones, have been incorporated into this court's record on appeal still under seal. But the order for authorization for the TT1, the first telephone, target telephone, is, and this is my estimation because it's sealed, but at record on appeal 5236, paragraph five of that order for authorization has the name of the DAG, the Deputy Associate Attorney General, listed. The same is true for the renewal application for TT1, which it should be at record on appeal 5394, same paragraph. These orders have similar language in this regard. And the TT2 order should be at ROA 5617, also at paragraph five. Those are the order for authorization on approval. That order contemplates an order for technical assistance, which is sometimes called the service provider order, and that is the order that is given to the service provider if assistance is needed to complete the wiretap. And that is a shortened form that includes only the information that's needed for the service provider to carry out the order from the court. It does not necessarily include who the target interceptees are, the target offenses, and in this case the DAG official's name because that information is not necessary for the service provider, AT&T, Verizon, what have you, to actually start the wiretap as ordered by the court. That order for technical assistance is what the jury saw. So when the service provider came in through the course of the trial and talked about setting up the order, setting up the intercept as directed by the court, the evidence was not the sealed document order for authorization for the wiretap. It was the order for technical assistance, which was a very shortened version of the order for authorization. And I think that's our miscommunication here. So if the court looks at the sealed documents that were recently made part of their record, they will find in each order for authorization or approval the DAG's name and then on subsequent pages the actual signature. So there just may be a misunderstanding of the two types of orders that are at play in a Title III case, and only the order for authorization or approval requires those technical details. There are reasons for having two different orders, primarily that we don't want third parties to have information they don't need to know because the targets can be made aware intentionally or inadvertently of the wiretap, and that can impede an investigation. Mr. Alkibulan also briefly addressed standing. It may be worth backing up just a moment. So just before trial, a motion to suppress the fruits of the wiretap was presented to the district court. This happened after the deadline for the dispositive motion, and the court denied after having briefing and argument, the court denied that motion for three independent reasons. One was the fact that it was untimely and that there was no cause shown for the untimeliness of that motion. Another was for lack of standing to challenge the wiretap and that the defendants had not even tried to show that they had standing to challenge the wiretaps. On the untimeliness issue, I think your learned friends on the other side argue that the video interview was not disclosed to them until like three days before the dispositive deadline. Is that accurate? The A video, I think that may be accurate as to A video that was not in the federal government's possession, and I just say that as a term of art, the government's possession, but that the video of the Mirandized interview with Mr. Gowdy had been produced, I want to say months before November, perhaps before the April or May trial. Even after the district court went through the facts and the timelines of the discovery production, it found that this was untimely because of what information the defendants had at the time before they filed their motion to suppress. And the third independent reason that the district court had for denying the motion to suppress the wiretap is that the defendants didn't put forward specific allegations that would allow the government to respond to any alleged deficiencies in the application affidavit for the wiretap. The issue of the named DAG official was not raised below and so would normally be deemed as forfeited, but even under the plain error standard, if this court were to take that up, there is no error. So that issue can be resolved just by review of the documents. The untimeliness issue, neither defendant takes up on appeal as to any reason for the untimeliness of their motion to suppress, nor have the defendants taken up the standing issue, specifically have not asserted that they had standing and have not asserted that they presented those arguments to the district court for what basis they have for standing to challenge any particular intercepted conversation. And then even if this court were to find that the district court erred with respect to the untimeliness decision or for the standing decision, we still lack specific allegations and certainly had no allegations at the time that this was challenged when the jury was waiting to be seated. We lack specific allegations that would have allowed the government to respond to what alleged deficiencies there might have been in the wiretap. The few allegations that did come from defense counsel below and trial counsel were different than appellate counsel. The district court described, and I'm referencing pages 934 to 36 of the Record on Appeal, the district court invited counsel to provide reasons to grant the motion to suppress the wiretap other than a few misspellings of words or minor scrivener's errors. And so that was the totality of what was presented to the district court below for while the motion to suppress the wiretap was not granted. Those are the issues that have been raised in oral arguments so far. Are there other – there were many pieces of this challenged in the briefing, so if there are other things that the court would like to hear, I'm happy to try to address those. I will yield back my time. Thank you. Thank you. which are insufficient on their face. The government didn't address this issue, the insufficiency of those orders in their brief, nor here before you today. And if the orders had been suppressed at trial because of their facial insufficiency, we wouldn't have gotten into any jury argument or any proof before the jury. Let me be clear what happened. You didn't raise the facial insufficiency in the district court, is that correct? That's correct. Okay, so the district court never had the opportunity to say, I have looked at the other order, the sealed orders, and I know that it has the person, the authorizing or requesting person's name on it. So you don't know that that didn't happen, right? Correct. So we now know what the district court had. We now have the sealed documents, and we know what they say. Correct. And you're not entitled to see those sealed documents, are you? I'm not certain of that. I wasn't the trial counsel. But I'm just saying that the trial judge could have very well looked at them, and if the trial judge had looked at them, would see what we can see now. Are you with me? Yes, I agree. Okay. But the trial court would have seen G-1 and G-2 and G-3 and would be able to see that they were facially insufficient because they did not include what Title III required that they have there in the order. And so then the court on its own could have suppressed those orders. Why would you suppress those orders if the actual order, the sealed order, comports with the requirements? Well, G-1, G-2, and G-3 do not conform with the requirements. They're facially insufficient. They do not specify the identity of the person authorizing the application. Okay. Thank you.  May I please report? I just want to briefly address the counsel office's argument that there was some type of concerted action between these defendants. They mentioned about how there was some type of, she suggested some type of pooling of money. Government Exhibit 7 describes a May 28, 2020 conversation where the Burrages were talking about the delay in receiving the methamphetamine. My client, Orlando Burrage, was at work, according to the recording, and Donovan was doing whatever he was doing, and they simply suggested so that they will not miss the supplier, Mr. Ford, that they would, one had planned to just leave his money behind with the other so they can purchase it. That is in no way suggesting they were pooling their money to purchase dope. None whatsoever. They were not pooling their money to purchase dope together. They had separate operations altogether. These two, and the evidence does not show this in any way, shape, or form, did not have any shared interests other than the fact that they were both drug dealers. But they didn't help each other. They did not recruit for one another. They didn't travel with one another. No storage facilities with the other. They were not discounting drugs for the other. You have to have, in this case of conspiracy, an agreement. An agreement to distribute. Okay. When one of them paid his own share and you say the cousin's share. Well, that was the intent because they never did pay anything because the seizure was seized. Wasn't one of them going to hold the drugs that he anticipated receiving for the other? If, in fact, one had received a call from Ford and the other had not, then the one was. That's correct. But the idea, the plan was they were both supposed to meet for it separately. That was the plan. That was the idea because they had separate orders. But then when one of them was at work, the other said, I will pay for yours. Well, he said that he would give the money to the other to pay for the drugs. That's correct. There's no doubt about that. And then the other would take the delivery for both of them. That was what they were thinking. That's what they were thinking. And then that person would hold and somehow transport the other person's drugs to him. But I don't see how that's different from the so-called agreement in U.S. v. Holloway where the older drug dealers took turns selling on a particular street. In fact, that's what the government argued. They took turns selling on the street. That was the agreement. But that did not discount the fact that there was parallelism, as the court mentioned, parallel businesses. Each had their own operation. They were parallel. But thank you.